STATE OF CONNECTICUT *v.* ANDRE D. MARTIN
(AC 25823)

Schaller, DiPentima and Rogers, Js.

Argued March 24—officially released November 21, 2006

*Arthur L. Ledford*, special public defender, for the appellant (defendant).

*C. Robert Satti, Jr.*, senior assistant state's attorney, with whom, on the brief, was *Jonathan C. Benedict*, state's attorney, for the appellee (state).

### Opinion

DiPENTIMA, J. The defendant, Andre D. Martin, appeals from the judgment of conviction, rendered after a jury trial, of attempt to possess one kilogram or more of marijuana with intent to sell by a person who is not drug-dependent in violation of General Statutes §§ 21a-278 (b)[1] and 53a-49,[2] possession of four ounces or more

---

[1] General Statutes § 21a-278 (b) provides in relevant part: "Any person who . . . possesses with the intent to sell . . . one kilogram or more of a cannabis-type substance . . . and who is not at the time of such action a drug-dependent person, for a first offense shall be imprisoned not less than five years nor more than twenty years . . . ."

[2] General Statutes § 53a-49 (a) provides: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the

of a cannabis-type substance in violation of General Statutes § 21a-279 (b),[3] and conspiracy to possess one kilogram or more of marijuana with intent to sell in violation of General Statutes §§ 21a-277 (b), 21a-278 (b) and 53a-48.[4] On appeal, the defendant claims that the evidence was insufficient to convict him on these charges. We agree and therefore reverse the judgment of the trial court.[5]

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. At the end of May, 2003, Donahue Hibbert, a special agent assigned to the Bridgeport office of the federal Drug Enforcement Administration (DEA) was contacted by Thomas Barbee, an agent with the Tucson, Arizona, office of the DEA. Barbee contacted Hibbert regarding a suspicious package that had been left at the Yellow Freight Company (Yellow Freight) in Tucson to mail to an address in Bridgeport. Although the address to which the package was to be mailed existed, a background investigation revealed that the name to

circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[3] General Statutes § 21a-279 (b) provides in relevant part: "Any person who possesses or has under his control . . . four ounces or more of a cannabis-type substance . . . for a first offense, may be imprisoned not more than five years or be fined not more than two thousand dollars or be both fined and imprisoned . . . ."

[4] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

[5] The defendant also claims (1) that his due process rights were violated, specifically his right against double jeopardy, because of his conviction of both attempt to possess one kilogram or more of marijuana with the intent to sell and possession of more than four ounces of marijuana, and (2) that the court improperly excluded as hearsay statements by his alleged coconspirators that exculpated him. Because we agree with the defendant that the evidence was insufficient to sustain his conviction, we need not reach these claims.

whom the package was addressed was fictitious. On either May 31 or June 1, 2003, the DEA agreed to allow the package to be routed to Connecticut, but with delivery at the Yellow Freight facility in Middletown. No surveillance was conducted on the package in route.

When the package arrived at the Middletown facility on June 9, 2003, Yellow Freight informed Hibbert, who had obtained a federal search warrant for the package prior to its arrival. Hibbert brought the package to the state police building located in Meriden, which is approximately five to ten miles from Yellow Freight. Together with state police, Hibbert opened the package, which was found to be a wooden crate. Inside were four white buckets that resembled five gallon paint buckets. Each bucket contained one or more large bundles heavily wrapped in plastic. Upon examining the material packed in the bundles, Hibbert believed the substance was marijuana on the basis of his extensive previous experience, but he did not perform a field test on the substance. Later laboratory tests confirmed that the substance in the package was marijuana, and the total weight of the material was approximately eighteen pounds.[6] The marijuana, at the point of entry into the country, would sell wholesale for $400 to $500 per pound and would sell retail for $1000 to $1200 per pound. In the Bridgeport area, the marijuana would have a markup of three to four times the original retail price per pound.

Because the total weight of marijuana did not meet the threshold for federal prosecution, it was decided that the high intensity drug trafficking area task force, comprised of federal, state and local officials, would seek state prosecution of any violation of the state drug

---

[6] The package weighed approximately twenty-eight pounds, but analysis of the plant material in the package alone confirmed that there was slightly more than eighteen pounds of marijuana in the package.

dependency laws. The state's attorney's office decided that all but 4.4 ounces of the marijuana would be removed from the package. The package then was filled to approximate its original weight. Jeremy DiPietro, a detective with the Bridgeport police department, and a state trooper took over the investigation and, on the evening of June 9, 2003, the state trooper, working undercover, telephoned the person Yellow Freight was to contact to pick up the package. He told the person to pick up the package at approximately noon the following day. On June 10, 2003, the trooper and DiPietro transferred the package from the state police office back to Yellow Freight.

On June 10, 2003, police set up surveillance of Yellow Freight and the immediate surrounding area. Hibbert and DiPietro were at "point of contact" in the Yellow Freight parking lot, approximately 2000 feet from the loading dock. William Brooks, a detective with the Bridgeport police department, was located in the loading dock area conducting video surveillance. Edwin Kohl, a state detective assigned to the statewide cooperative crime control task force with the DEA in Bridgeport, conducted aerial surveillance from a DEA plane using binoculars and a camera. The surveillance operation of the Yellow Freight facility on June 10, 2003, revealed the following scenario.

At approximately 12:15 p.m., a tan Mitsubishi Gallant entered the lower parking lot of the Yellow Freight complex with a man driving and a woman in the front passenger seat. The woman, later identified as Janine Crockett, got out of the car and spoke with a Yellow Freight representative. The man in the car appeared to be talking on a cellular telephone as Crockett reappeared, spoke to him and then got back into the car. The car left the lot and turned onto Country Club Road, where it rendezvoused with another vehicle, a maroon

Chevrolet,[7] for approximately one to two minutes. The tan Mitsubishi then returned, and Crockett again got out of the vehicle, this time holding an unidentifiable object in her left hand. When she again returned to the vehicle, it backed up to the loading dock, and the man in the vehicle made a call on his telephone. A Yellow Freight employee brought the package to the individuals in the vehicle. The package at first was too large to maneuver into the vehicle, and Crockett had to move up her seat in order to fit the package in the backseat. The Yellow Freight employee handed the man a signature receipt, and he, in turn, gave it to Crockett. Crockett refused to sign the receipt and handed it back to the man, who signed it himself and returned it to the employee.

Some time after the tan Mitsubishi completed its first trip into the Yellow Freight parking lot, but before its second trip, during which its occupants picked up the package, the maroon Chevrolet entered the lot and drove into the lower parking lot where Hibbert and DiPietro were located. The vehicle, which was occupied by two men, one of whom later was identified as the defendant, drove slowly around the lot. It then stopped, and the defendant, who was a passenger in the vehicle, got out of the car. The defendant was out of the vehicle for fewer than five minutes, during which time he walked around the lot, casually looking at the vehicles in the lot as he passed them. He then returned to the vehicle, and the Chevrolet left the lot. Shortly thereafter, the tan Mitsubishi returned, and the package was picked up.

When the tan Mitsubishi left the lot after the package was picked up, it was driven away from the entrance

---

[7] Investigation uncovered that the maroon Chevrolet was a rental car from an agency located in Bridgeport. The defendant had rented the car in his name with a Florida driver's license.

ramp to Interstate 91 and again rendezvoused with the maroon Chevrolet. Then both vehicles merged onto Interstate 91 southbound and together traveled to 98 Holly Street in Bridgeport.[8] As they traveled, the two vehicles maintained a consistent distance from each other, remained primarily in the right lane and traveled within the speed limit; the vehicles did not make any quick lane changes or do anything else to attract attention. The surveillance team maintained sight of the vehicles until they reached their destination.

After the vehicles reached the Holly Street residence, an individual, later identified as Keith Mangan, was seen bringing the package into the house. The defendant testified that he helped Mangan carry the crate up the stairs in front of the house. The maroon Chevrolet was not seen in front of the house again after the defendant left it and entered the house.

The surveillance team waited several minutes after seeing the package brought into the house before executing the search and seizure warrant. It was understood by the officers executing the warrant that all people involved were to be arrested. When Hibbert, who was the first officer at the front door of the house, approached, a woman identified as Diana York was on the porch. Hibbert identified himself, and York ran inside and slammed the front door shut. An officer behind Hibbert opened the door with a breach tool, and Hibbert entered the apartment. York was just inside the front door, and the defendant was approximately twelve feet from the door, in the living room. Mangan was in the bedroom, which was off to the left. Hibbert told everyone to get on the floor, and everyone, including the defendant, was compliant. Hibbert located the

---

[8] The apartment located at 98 Holly Street belonged to Diana York, and Keith Mangan also resided there. Both individuals were suspected of being involved in transporting drugs.

crate, still sealed, in the bathroom, inside a freestanding tub and concealed by a shower curtain. The defendant and Mangan were equidistant from the bathroom where the package was discovered.

Hibbert conducted a patdown search of the defendant. The defendant was in possession of a wallet, a cellular telephone, an $800 check and $1291 in cash. The cash was comprised of a few fifty dollar bills, but mostly twenty, ten and five dollar bills. The defendant told Hibbert that the cash was for a car payment he had to make on his Mercedes Benz, which was being repaired that day. The defendant did not have any weapons, drugs, or drug paraphernalia on his person. After the defendant was arrested, Hibbert checked his name with the narcotic and dangerous drugs information systems, which revealed that the defendant had no past drug related offenses and was not the subject of a current drug related investigation.

Additionally, the following information was elicited from the defendant on cross-examination.[9] Although he had been living in Connecticut for at least four years prior to the trial, the defendant did not have a Connecticut driver's license. He initially had a New York driver's license and then obtained a Florida driver's license in March, 2003. The defendant never resided at the addresses listed on either of his driver's licenses, and his personal vehicle was registered to a post office box in New Rochelle, New York. The defendant used his false Florida address to rent the Chevrolet that was

_____

[9] Although the defendant made a motion for a judgment of acquittal at the culmination of the state's case, that motion was denied, and the defendant then chose to take the witness stand. Our review of the sufficiency of the state's evidence against him, therefore, encompasses not only evidence adduced during the state's case-in-chief, but also all reasonable inferences the jury could have drawn from the defendant's testimony. See *State* v. *Perkins*, 271 Conn. 218, 220–22, 856 A.2d 917 (2004) (explaining and upholding constitutionality of "waiver rule").

used on June 10, 2003. The defendant admitted that he never had paid taxes to either the state or federal government, although he indicated that he believed that he paid taxes to the government when making car insurance payments. The defendant was unable to account for the origin of money he used to pay for rent, food for himself and his family, car payments and jewelry, especially during periods of time when he claimed not to have had a job and was receiving welfare payments from the state. The defendant could not indicate clearly the dates during which he was employed, and evidence was presented that he had lied to Hibbert about his job, stating that he was unemployed on June 10, 2003, but that his prior job was as a graphic designer when, in fact, he worked in a hair salon. The defendant also admitted to having pleaded guilty to assault and a weapons charge, which arose from a dispute he had had with his child's mother.

The defendant claims that the state presented insufficient evidence to prove beyond a reasonable doubt that he (1) had dominion and control over the marijuana and (2) had knowledge that marijuana was contained in the package. We agree with the defendant that the state presented insufficient evidence that he knew the contents of the package.[10]

When reviewing sufficiency of the evidence claims, we employ a two part test. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts

---

[10] Because we conclude that the evidence was insufficient to prove the element of knowledge for all three charges, we need not decide whether the state presented evidence sufficient to prove that the defendant exercised dominion and control over the package. We do note, however, the weakness of the state's case in this regard, at least as to principal responsibility, as it relied on the defendant's presence in an apartment which he neither occupied nor visited regularly and his helping Mangan move the package into the apartment.

so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Boscarino*, 86 Conn. App. 447, 454, 861 A.2d 579 (2004).

"While . . . every element [must be] proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense[s], each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . [I]n determining whether the evidence supports a particular inference, we ask whether that inference is so unreasonable as to be unjustifiable. . . . [A]n inference need not be compelled by the evidence; rather, the evidence need only be reasonably susceptible of such an inference. . . . Moreover, [i]n evaluating evidence that could yield contrary inferences, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . Finally, we must remember that it is the jurors who are the arbiters of fact. [W]e do not sit as the seventh juror when we review the sufficiency of the evidence . . . rather, we must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict of guilt beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *State* v. *Glasper*, 81 Conn. App. 367, 371–72, 840 A.2d 48, cert. denied, 268 Conn. 913, 845 A.2d 415 (2004). Although we review the sufficiency of the evidence in the light most favorable to sustaining the verdict, those facts underlying the jury's conclusions must be based on reasonable inferences drawn, not mere speculation. See

*State* v. *Goodrum*, 39 Conn. App. 526, 540, 665 A.2d 159, cert. denied, 235 Conn. 929, 667 A.2d 554 (1995).

I

An essential element of possession and possession with the intent to sell is that the offender have knowledge of the character of the illegal substance he possesses, in this instance, marijuana. See *State* v. *Gooden*, 89 Conn. App. 307, 319, 873 A.2d 243 ("similar to its lesser included offense of possession of [a cannabis-type substance], the crime of possession of a [cannabis-type] substance with the intent to sell . . . includes the element of knowledge" [internal quotation marks omitted]), cert. denied, 275 Conn. 918, 919, 883 A.2d 1249 (2005); see also *Illinois* v. *Andreas*, 463 U.S. 765, 769 n.3, 103 S. Ct. 3319, 77 L. Ed. 2d 1003 (1983) ("[M]ere fact that [an individual] takes possession of [a] container would not alone establish guilt of illegal possession or importation of contraband. The recipient of the package would be free to offer evidence that *the nature of the contents were unknown to him; the nature of the contents and the recipient's awareness of them would be issues for the factfinder.*" [Emphasis added.]); *State* v. *Parent*, 8 Conn. App. 469, 473, 513 A.2d 725 (1986) ("to establish illegal possession of narcotics the state must prove, not only that the defendant exercised dominion and control over the substance, [but that he] had knowledge of its presence, and *had knowledge of its narcotic character*" [emphasis added; internal quotation marks omitted]). Although a "trier of fact may infer that a defendant who is in fact in physical possession of a substance knows the character of the substance and knows of its presence"; (internal quotation marks omitted) *State* v. *Shipp*, 79 Conn. App. 427, 433, 830 A.2d 368, cert. denied, 267 Conn. 902, 838 A.2d 212 (2003); when, as here, the state proceeds under a theory

of constructive possession,[11] "it may not be inferred that [the defendant] knew of the presence of the [substance] and had control of [it], unless there are other incriminating statements or circumstances tending to buttress such an inference." (Internal quotation marks omitted.) *State* v. *Gooden*, supra, 316.

The state argues that the defendant's role in picking up the package suffices as the incriminating circumstances tending to buttress an inference that the defendant knew that the package contained marijuana. The state cites the actions engaged in by both vehicles when picking up the package at the Yellow Freight facility, specifically, the use of two vehicles, the fact that the vehicles did not enter the highway immediately after retrieving the package, the traveling of the two vehicles in tandem, the vehicle in which the defendant rode driving around the Yellow Freight parking lot and the defendant walking through that lot on foot while looking at the cars stationed there. The state cites the testimony of Hibbert and Kohl, who identified these actions

---

[11] Where . . . the [marijuana was] not found on the defendant's person, the state must proceed on the theory of constructive possession, that is, possession without direct physical contact. . . . One factor that may be considered in determining whether a defendant is in constructive possession of [marijuana] is whether he is in possession of the premises where the [marijuana is] found. . . . Where the defendant is not in exclusive possession of the premises where the [marijuana is] found, it may not be inferred that [the defendant] knew of the presence of the [marijuana] and had control of [it], unless there are other incriminating statements or circumstances tending to buttress such an inference. . . . To mitigate the possibility that innocent persons might be prosecuted for . . . possessory offenses . . . it is essential that the state's evidence include more than just a temporal and spatial nexus between the defendant and the contraband. . . . While mere presence is not enough to support an inference of dominion or control, where there are other pieces of evidence tying the defendant to dominion and control, the [finder of fact is] entitled to consider the fact of [the defendant's] presence and to draw inferences from that presence and the other circumstances linking [the defendant] to the crime." (Internal quotation marks omitted.) *State* v. *Smith*, 94 Conn. App. 188, 193–94, 891 A.2d 974, cert. denied, 278 Conn. 906, 897 A.2d 100 (2006).

as countersurveillance techniques. Yet, even if we were to allow for the jury's having made a reasonable inference that the defendant, in fact, was engaging in countersurveillance, his actions, although possibly incriminating of something, did not show that he knew the package contained marijuana. These same actions could lead the jury to speculate that the defendant knew the package contained stolen goods, weapons, falsified documents or any other product used for illicit purposes. To conclude that the defendant knew the package contained marijuana is neither more nor less speculation than to conclude that he knew the package contained any of these other products, which speculation, in and of itself, is insufficient to support his conviction.

The state also argues that the defendant's use of a rental car to pick up the package, the use of a Florida address to rent the vehicle, his unexplained access to cash and his inconsistent statements regarding his employment at the time of the offense buttress the inference that the defendant knew the package contained marijuana. As with the state's argument regarding the countersurveillance techniques in which the defendant engaged, we find the argument unavailing. Although these factors may show that the defendant knew he was engaging in some type of illicit activity, they do not show that he knew the precise nature of the contents of the package.[12]

---

[12] The state also argues that the fact that the defendant was found with $1291 in cash on his person can lead to an inference that he knew the contents of the package because one pound of marijuana would sell for approximately $1200. The package in this case was to contain eighteen pounds of marijuana, and only a handful of people were involved in this leg of the operation. To say that the defendant had enough money to buy one pound of marijuana and therefore knew the package contained marijuana is as incongruous as saying that the defendant had enough money to buy two guns, and the package contained thirty; therefore, he must have known that the package contained guns. This factor, even combined with all the other inferences that the state urged the jury to make, does not suffice to show knowledge.

In this case, we are not presented with a factual scenario in which the defendant was found with drugs, drug paraphernalia or even a weapon on his person. See *State* v. *Clark*, 255 Conn. 268, 294, 764 A.2d 1251 (2001); *State* v. *Wright*, 47 Conn. App. 559, 565, 707 A.2d 295, cert. denied, 244 Conn. 917, 714 A.2d 8 (1998); *State* v. *Hilton*, 45 Conn. App. 207, 218–19, 694 A.2d 830, cert. denied, 243 Conn. 925, 701 A.2d 659 (1997), cert. denied, 522 U.S. 1134, 118 S. Ct. 1091, 140 L. Ed. 2d 147 (1998). Although the defendant was inside the house when the search team discovered the drugs, he was not found in a location where drugs were out in the open, nor was he exhibiting any signs of drug use himself. See *State* v. *Sanchez*, 75 Conn. App. 223, 241–42, 815 A.2d 242, cert. denied, 263 Conn. 914, 821 A.2d 769 (2003); *State* v. *Delarosa*, 16 Conn. App. 18, 34, 547 A.2d 47 (1988). There also was no evidence to suggest that the defendant regularly frequented the house and would have reason to know that drugs were present there.

As an essential element of the crimes, the defendant's knowledge of the marijuana contained in the package he helped transport had to be proven beyond a reasonable doubt. To meet this burden, it is insufficient for the state simply to demonstrate that the defendant was engaging in illicit or even illegal behavior. See generally *State* v. *Gooden*, supra, 89 Conn. App. 318–20. The state was required to prove some additional incriminating circumstance *related to illegal drugs*. No such evidence was produced in this case. Consequently, the state has failed to satisfy its burden, and the conviction cannot stand.

Finally, this court is wary of the repercussions that affirming the defendant's conviction would have on future cases. To hold that these facts are sufficient to satisfy the knowledge element in a possession of narcotics charge would expose to criminal culpability

the innocent bystanders that this requirement was meant to protect. See *State* v. *Parent*, supra, 8 Conn. App. 473 (mere acceptance of package containing narcotics is insufficient basis for inference of knowledge of its contents; otherwise "recipient of the package would be liable to conviction, not because of the criminality of his own behavior but because of the wholly unilateral act of the sender" [internal quotation marks omitted]); see also *Illinois* v. *Andrea*, supra, 463 U.S. 769 n.3.

## II

The state also argues that even if the evidence was insufficient to support the defendant's conviction of possession and possession with the intent to sell as a principal, the defendant also was convicted of conspiracy, and the jury could have found him guilty under the theories of accessory liability on which it was charged. The defendant claims that because the evidence was insufficient to prove he had knowledge of the contents of the package, the evidence also was insufficient to convict him of conspiracy because that crime also includes the element of knowledge.[13] We agree with the defendant.

---

[13] We note that the defendant does not make this argument in the most artful fashion, and the state has argued that the claim has not been raised properly for our review. The defendant has raised the claim, albeit briefly, and the argument for reversing his conviction on the conspiracy count essentially mirrors the argument he makes in depth for reversing the conviction of the substantive offenses. In this case, therefore, where the crimes of which the defendant has been convicted are so intertwined that an injustice would result if we were not to review the defendant's claim, as this would permit his conviction of all three offenses to stand on the basis of accessory liability or liability pursuant to *Pinkerton* v. *United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946), we decline the state's invitation to dispose of the claim in such a cursory manner. We do caution all parties, however, that it is the policy of this court not to review claims that have been abandoned through inadequate briefing. See *State* v. *Bermudez*, 95 Conn. App. 577, 590 n.2, 897 A.2d 661 (2006).

"Conspiracy is a specific intent crime, with the intent divided into two elements: (a) the intent to agree or conspire and (b) the intent to commit the offense which is the object of the conspiracy. . . . To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the conspirators intended to agree but also that they *intended to commit the elements of the offense.*" (Emphasis in original; internal quotation marks omitted.) *State* v. *Sanchez,* supra, 75 Conn. App. 240. Therefore, it is not enough that the state may be able to show that the defendant had an agreement with Mangan to go to Yellow Freight and to pick up the package that awaited them there; the state also must show that the defendant, when picking up that package, knew that it contained marijuana. As with the knowledge elements for possession and possession with the intent to sell, the state did not present sufficient evidence of the defendant's knowledge to sustain its burden in proving a conspiracy.

The judgment is reversed and the case is remanded with direction to render judgment of not guilty.

In this opinion ROGERS, J., concurred.

SCHALLER, J., dissenting. "A conviction of the crime of conspiracy can be based on circumstantial evidence, for conspiracies, by their very nature, are formed in secret and only rarely can be proved otherwise than by circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Leggett,* 94 Conn. App. 392, 400, 892 A.2d 1000, cert. denied, 278 Conn. 911, 899 A.2d 39 (2006). I respectfully dissent from the majority opinion because, in my view, there was sufficient circumstantial evidence to sustain the conviction of the defendant, Andre D. Martin, of conspiracy to possess with the intent to sell one kilogram or more of a cannabis-type

substance. By operation of *Pinkerton*[1] liability, I would further conclude that the defendant's conviction of attempt to possess with intent to sell one kilogram or more of a cannabis-type substance and possession of more than four ounces of marijuana were supported by the evidence adduced in this case.[2] I would, therefore, proceed to address the other issues raised by the defendant in this appeal. See, e.g., *Connecticut National Bank* v. *Giacomi*, 233 Conn. 304, 351, 659 A.2d 1166 (1995) (*Borden, J.*, dissenting).

## I

I begin by setting forth the standard of review and legal principles pertinent to a claim of insufficient evidence. Our Supreme Court has instructed: "The standard of review we apply . . . is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. *Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt.* . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude

---

[1] *Pinkerton* v. *United States*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946).

[2] I agree with my colleagues in the majority that the defendant's brief does not discuss the *Pinkerton* issue in the most artful fashion. Nevertheless, I disagree with the state's contention that this claim was abandoned as a result of an inadequate brief. Accordingly, review of this claim is warranted. See footnote 13 of the majority opinion.

*that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .*

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Emphasis added; internal quotation marks omitted.) *State* v. *Ledbetter,* 275 Conn. 534, 542–43, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006); see also *State* v. *Calabrese,* 279 Conn. 393, 402–403, 902 A.2d 1044 (2006).

During appellate review of a sufficiency claim, this court does not consider whether it believes the defendant to be innocent or guilty. *State* v. *Mulero,* 91 Conn. App. 509, 513, 881 A.2d 1039 (2005), cert. denied, 277 Conn. 912, 895 A.2d 792, cert. denied, 549 U.S. 862, 127 S. Ct. 149, 166 L. Ed. 2d 108 (2006). Instead, we limit our consideration to whether any rational trier of fact could have found the essential elements of the charged offenses to have been committed beyond a reasonable doubt. Id. *"Furthermore, [i]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence."* (Emphasis added; internal

quotation marks omitted.) *State* v. *Garner*, 270 Conn. 458, 473, 853 A.2d 478 (2004). Indeed, our Supreme Court has expressly instructed that "[c]ircumstantial evidence has the same probative force as direct evidence . . . ." *State* v. *Farnum*, 275 Conn. 26, 36, 878 A.2d 1095 (2005); see also *State* v. *Quinet*, 253 Conn. 392, 407, 752 A.2d 490 (2000). Simply put, our scope of review is limited when we consider whether any rational trier of fact could have found the defendant guilty. See *State* v. *Smith*, 94 Conn. App. 188, 192–93, 891 A.2d 974, cert. denied, 278 Conn. 906, 897 A.2d 100 (2006).

## II

It is useful to review briefly the legal doctrine known as *Pinkerton* liability. In *Pinkerton*, two brothers were indicted for ten substantive violations of the Internal Revenue Code and one conspiracy count. *Pinkerton* v. *United States*, 328 U.S. 640, 641, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946). One of the brothers, however, did not participate directly in the substantive offenses, but was a coconspirator. Id., 645. The United States Supreme Court noted that "[i]t has been long and consistently recognized . . . that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses." Id., 643. The court further stated that conspiracy is often a greater harm than the substantive offense because it involves a deliberate, often secretive plotting of two or more individuals to subvert the law. Id., 643–44. The court held that if one member of a conspiracy is guilty of committing a substantive offense in furtherance of the conspiracy, then all members of the conspiracy are also guilty of the substantive offense. Id., 647.

Our Supreme Court recently has summarized the history of *Pinkerton* liability with respect to our state's criminal jurisprudence. "This court first explicitly

adopted the *Pinkerton* principle of vicarious liability for purposes of our state criminal law in *State* v. *Walton*, 227 Conn. 32, 630 A.2d 990 (1993). Under the *Pinkerton* doctrine, which, as of the date of our decision in *Walton*, was a recognized part of federal criminal conspiracy jurisprudence . . . a conspirator may be held liable for criminal offenses committed by a coconspirator that are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy. . . . The rationale for the principle is that, when the conspirator [has] played a necessary part in setting in motion a discrete course of criminal conduct, he should be held responsible, within appropriate limits, for the crimes committed as a natural and probable result of that course of conduct. . . .

"We concluded in *Walton* that the *Pinkerton* principle was applicable in state criminal cases, reasoning, first, that *Pinkerton* liability is not inconsistent with our penal code and, therefore, that we were not prohibited from recognizing that theory of criminal liability as a matter of state common law. . . . Without foreclosing the use of the *Pinkerton* doctrine in other circumstances, we then concluded that application of the doctrine was appropriate in *Walton*, in which [1] the defendant was a leader of the conspiracy, [2] the offense for which vicarious liability was sought to be imposed was an object of the conspiracy and [3] the offense was proved by one or more of the overt acts alleged in support of the conspiracy charge. . . .

"In *State* v. *Diaz*, [237 Conn. 518, 679 A.2d 902 (1996)], we were required to decide whether to extend the principle of vicarious liability that we adopted in *Walton* to a case in which not all of [the three *Walton*] conditions have been met, a question that we expressly reserved in *Walton*. . . . In *Diaz*, the defendant had

been convicted of, inter alia, murder under the *Pinkerton* doctrine and conspiracy to commit murder. . . . The evidence showed that the defendant, along with several other individuals, had fired multiple gunshots into a motor vehicle occupied by the victim and three others. . . . The victim was struck and killed by a single bullet. . . . The defendant claimed on appeal that the court's instruction under the *Pinkerton* doctrine had been improper because, among other reasons, it was broader than the limited version of the doctrine recognized in *Walton*. . . . This court acknowledged that the state had not proved that the defendant was the leader of the conspiracy to ambush the vehicle and its occupants and, thus, had not established the first condition for *Pinkerton* liability set forth in *Walton*. . . . We noted, however, that the evidence reasonably established that the defendant was a fully engaged member of the conspiracy who had actively participated in the shooting and that he, along with his coconspirators, intended to kill one or more of the vehicle's passengers. . . . *We concluded that where . . . the defendant was a full partner in the illicit venture and the coconspirator conduct for which the state has sought to hold him responsible was integral to the achievement of the conspiracy's objectives, the defendant cannot reasonably complain that it is unfair to hold him vicariously liable, under the Pinkerton doctrine, for such criminal conduct.* . . . We further concluded that *Pinkerton* liability *may* be imposed even if none of the three *Walton* conditions is present. . . .

"We also acknowledged, however, that there may be occasions when it would be unreasonable to hold a defendant criminally liable for offenses committed by his coconspirators even though the state has demonstrated technical compliance with the *Pinkerton* rule. . . . For example, a factual scenario may be envisioned in which the nexus between the defendant's role in the

conspiracy and the illegal conduct of a coconspirator is so attenuated or remote, notwithstanding the fact that the latter's actions were a natural consequence of the unlawful agreement, that it would be unjust to hold the defendant responsible for the criminal conduct of his coconspirator. In such a case, a *Pinkerton* charge would not be appropriate." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Coltherst*, 263 Conn. 478, 491–93, 820 A.2d 1024 (2003); see also *State* v. *Martinez*, 278 Conn. 598, 611–15, 900 A.2d 485 (2006). With these background principles in mind, I now turn to the facts of the present case.

### III

In count three of the amended information, filed February 10, 2004, the defendant was charged as follows: "And said state's attorney further accuses [the defendant] with the crime of conspiracy and charges that on or about June 9, 2003 until June 10, 2003, at Bridgeport, Middletown, Connecticut, Tuscon, Arizona, and other locations in the State of Connecticut, the [defendant] with intent that conduct constituting the crime of Violation of the State Dependency Producing Drug Law, in violation of [General Statutes §§] 21a-278 (b) and 21a-277 (b) be performed, agreed with Keith Mangan, Jannine Crockett, Jonathan James, David Campbell, Tonya James, and others unknown, and there was committed one or more overt acts in the performance of such conspiracy in violation of [General Statutes §] 53a-48 . . . ." At this point, it is important to identify precisely the elements that the state was required to prove beyond a reasonable doubt in order to obtain a valid conviction.

"To establish the crime of conspiracy under § 53a-48, the state must show that there was an agreement between two or more persons to engage in conduct

constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy. . . . The state must also show intent on the part of the accused that conduct constituting a crime be performed. . . . The existence of a formal agreement between the parties need not be proved; it is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act. . . .

"[I]t is not necessary to establish that the defendant and his coconspirators signed papers, shook hands, or uttered the words we have an agreement. . . . [*T*]*he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts.*" (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Patterson*, 276 Conn. 452, 461–62, 886 A.2d 777 (2005); see also *State* v. *Padua*, 273 Conn. 138, 181–82, 869 A.2d 192 (2005); *State* v. *Henry*, 253 Conn. 354, 366–67, 752 A.2d 40 (2000). Simply put, "[t]he essence of [conspiracy] is an agreement to commit an unlawful act. . . . The prohibition of conspiracy is directed not at the unlawful object, but at the process of agreeing to pursue that object." (Internal quotation marks omitted.) *State* v. *Cavanaugh*, 23 Conn. App. 667, 670–71, 583 A.2d 1311 (1990), cert. denied, 220 Conn. 930, 598 A.2d 1100 (1991).

In *State* v. *Hernandez*, 28 Conn. App. 126, 135, 612 A.2d 88, cert. denied, 223 Conn. 920, 614 A.2d 828 (1992), this court explained that "[*t*]*o prove the offense of conspiracy to sell narcotics, the state must prove two distinct elements of intent: that the conspirators intended to agree; and that they intended to sell narcotics to another person.*" (Emphasis added.) See also *State* v. *Beccia*, 199 Conn. 1, 3, 505 A.2d 683 (1986); *State* v. *Leggett*, supra, 94 Conn. App. 402 (to sustain conviction for conspiracy to commit particular offense, state must

show not only that conspirators intended to agree, but also intended to commit elements of offense); *State* v. *Davis*, 68 Conn. App. 794, 799, 793 A.2d 1151 (same), cert. denied, 260 Conn. 920, 797 A.2d 518 (2002). It is necessary to identify the elements of possession with the intent to sell one kilogram or more of a cannabis-type substance to determine whether the defendant and his coconspirators intended to commit the crime.

"To obtain a conviction under § 21a-278 (b), the state must prove that the defendant possessed narcotics with the intent to sell them." *State* v. *Little*, 54 Conn. App. 580, 584, 738 A.2d 195 (1999). We recently stated: "[T]o prove illegal possession of a narcotic substance, it is necessary to establish that the defendant knew the character of the substance, knew of its presence and exercised dominion and control over it. . . . Where . . . the [narcotics were] not found on the defendant's person, the state must proceed on the theory of constructive possession, that is, possession without direct physical contact. . . . One factor that may be considered in determining whether a defendant is in constructive possession of narcotics is whether he is in possession of the premises where the narcotics are found. . . . Where the defendant is not in exclusive possession of the premises where the narcotics are found, it may not be inferred that [the defendant] knew of the presence of the narcotics and had control of them, unless there are other incriminating statements or circumstances tending to buttress such an inference. . . . While mere presence is not enough to support an inference of dominion or control, where there are other pieces of evidence tying the defendant to dominion and control, the [finder of fact is] entitled to consider the fact of [the defendant's] presence and to draw inferences from that presence and the other circumstances linking [the defendant] to the crime." (Internal quotation marks omitted.) *State* v. *Smith*, supra, 94 Conn.

App. 193–94; see also *State* v. *Fagan*, 92 Conn. App. 44, 49–50, 883 A.2d 8, cert. denied, 276 Conn. 924, 888 A.2d 91 (2005); *State* v. *Fermaint*, 91 Conn. App. 650, 655–56, 881 A.2d 539, cert. denied, 276 Conn. 922, 888 A.2d 90 (2005). Accordingly, the state was required to prove that the defendant in this case agreed and intended to possess, with the intent to sell, one kilogram or more of marijuana and that this agreement was followed by an overt act in furtherance of the conspiracy. A detailed review of the evidence before the jury is necessary, therefore, to explain my view that there was ample circumstantial evidence to support a finding of proof beyond a reasonable doubt of all of these elements by a reasonable trier of fact.

Donahue Hibbert, a special agent with the federal Drug Enforcement Administration and member of the high intensity drug trafficking area task force, testified that marijuana is often transported via shipment from commercial carriers, frequently from cities located in Arizona. After receiving information that a suspicious package was scheduled for shipment to an address in Bridgeport, he began a preliminary investigation. Hibbert learned that the package was addressed to a person who, according to his search, did not live at that address. The package was allowed to proceed to Connecticut and arrived on June 9, 2003, in Middletown. A federal search warrant was obtained, and the package, a wooden crate, was opened at the state police barracks in Meriden. Law enforcement agents discovered four heavily wrapped "paint buckets" containing a large quantity of marijuana. Hibbert indicated that by wrapping the buckets, the odor of marijuana[3] emanating from the buckets would be greatly diminished. A decision was made to remove all but 4.4 ounces of the marijuana

---

[3] Hibbert testified that the odor is the most unique characteristic of marijuana when compared to oregano or tomato plants.

and allow the intended recipient[4] to pick up the package at the Yellow Freight Company (Yellow Freight) location in Middletown.[5]

On June 10, 2003, an extensive surveillance of the Yellow Freight location was set up, including aerial support and video recording. At some point, a tan Mitsubishi Gallant entered the parking lot, and Hibbert observed a male and a female[6] in the vehicle. The female left the vehicle and spoke with a representative of Yellow Freight, and then returned to the Gallant. The male in the Gallant was observed speaking on a cellular telephone and then driving out of the parking lot.

Hibbert then observed two individuals in a maroon Chevrolet Monte Carlo reconnoiter the parking lot. The maroon vehicle very slowly circled the parking lot before coming to a stop. The passenger, whom Hibbert identified as the defendant, exited the maroon vehicle and examined the surroundings and the other vehicles parked in the lot.[7] Hibbert estimated that this process took "less than five minutes." The defendant then returned to the maroon vehicle and, after a few minutes, exited the parking lot. Hibbert testified that, on the basis of his experience as a law enforcement officer, the defendant's activities in the parking lot constituted a method of countersurveillance.

Edwin Kohl, a Connecticut state trooper, testified that he conducted the aerial surveillance on June 10, 2003, at the Yellow Freight location and observed the occupants of the Gallant meet with the occupants of

---

[4] A state trooper, acting in an undercover capacity, telephoned a representative of the person who was going to pick up the package and requested that he or she arrive at noon on June 10, 2003.

[5] Agents placed a transmitter inside the package that would signal when the package was opened. The transmitter subsequently became inoperative.

[6] William Brooks, a Bridgeport police officer who videotaped the events at the Yellow Freight location, later identified this individual as Janine Crockett.

[7] The driver of the maroon vehicle was later identified as David Campbell.

the maroon vehicle after the Gallant had left the parking lot. The Gallant returned to the Yellow Freight location, and its occupants accepted delivery of the package. The wooden crate was placed, with some difficulty, into the backseat. The female declined to sign for the package, handing the forms over to the driver. Kohl observed the tan and maroon vehicles exit the Yellow Freight location and enter another parking lot. Kohl characterized this behavior as "doing countersurveillance, you know, [to] see if, you know, if someone was tailing them."[8] He also explained that, in his years of experience in the narcotics field, it was a common tactic for those engaged in transporting narcotics to engage in countersurveillance.[9] After a few minutes, the two vehicles doubled back and began traveling southbound on Interstate 91. The maroon vehicle followed the tan vehicle during the drive to Bridgeport. Kohl testified that the tan "vehicle maintained the lead continuously throughout the trip, and the maroon colored vehicle kept at the same, consistent distance the entire route." Both vehicles remained in the right lane and were passed by many vehicles throughout the trip. According to Kohl's observations, the two vehicles did not engage in any "sudden lane changes or anything that would attract attention."

Kohl explained to the jury that on the basis of his years of experience, the individuals in the tan and maroon vehicles, as evidenced by their driving pattern from Middletown to Bridgeport, "made a very conscious

---

[8] Kohl later explained countersurveillance as "surveilling to see if anyone is surveilling them."

[9] Hibbert also testified that this action constituted a countersurveillance technique. "Our experience has been [that this tactic is] basically to make sure they are not being followed by law enforcement or anybody else. The vehicles have performed this type of technique where they would turn off onto a side street, pull over, wait to see who drives by. Then maybe resume their path of travel. So, that's a thing we have to watch out for when look out for these type of things."

and concerted effort not to violate any motor vehicle laws so as not to attract attention to themselves and . . . possibly get stopped by . . . a uniformed trooper, patrolman." He further stated that the larger the amount of narcotics being transported, the greater the protections that are taken by the traffickers.

Hibbert further testified that after the vehicles arrived in Bridgeport, he observed the defendant and Keith Mangan carrying the wooden crate into a home. He then gave the command to law enforcement personnel to execute the arrests of the individuals involved. Hibbert and the others approached the home, and Diana York, who was on the porch, slammed the door shut. Another officer used a breach device to open the door, and Hibbert, after entering, observed the defendant in the living room area. The defendant complied with Hibbert's order to get on the floor. Hibbert then found the wooden crate in a freestanding tub with the shower curtain drawn. All of the individuals in the home were placed in custody.

Hibbert conducted a patdown search of the defendant, who was handcuffed at this point. He discovered $1291, mostly in bills of small denomination, in the defendant's right front pocket. The defendant also had possession of a cellular telephone while Mangan, the other individual who had been in the maroon vehicle, did not. Hibbert testified that the street value of one pound of marijuana at that time was approximately $1200. He further stated that marijuana commonly was sold in small bags containing $10 dollars worth of the substance.[10] Hibbert also noted that, in his opinion, approximately eighteen pounds of marijuana, the amount contained in the four buckets packaged within the wooden crate, was not a quantity that would be used for personal use.

---

[10] This quantity of marijuana is commonly referred to as a "dime bag."

After the state rested, the defendant moved for a judgment of acquittal. The court denied this motion, and the defendant then testified. He stated that he believed the crate contained a transmission[11] and claimed essentially that he was doing a favor for a friend. The state conducted an extensive and vigorous cross-examination. The defendant admitted that he had a prior felony conviction for assaulting his girlfriend in 1999. Due to his immigration status, another felony conviction likely would result in his deportation to Jamaica. The defendant admitted that he did not pay any federal income tax and, despite an uncertain employment situation, had possessed both a Mercedes Benz and a Lexus motor vehicle. The evidence regarding his weekly income resulted in questions regarding how the defendant could have afforded such vehicles, as well as installment payments for pieces of jewelry, along with his other financial obligations. The defendant registered his vehicle to a post office box in New York while living in Connecticut. He never transferred his operator's license from New York to Connecticut. He did, however, obtain a Florida license in 2003, while living in Connecticut. While renting the maroon vehicle on June 10, 2003, he provided the rental company with a Florida address rather than his Connecticut address. The state, during its cross-examination, suggested that the reason for using this license was to make it more difficult to trace the rental vehicle back to the defendant. The defendant was unable to recall when he moved from Plymouth Street to Bassett Street in New Haven. The defendant testified that he worked as a hair stylist but told the arresting officers that he was

---

[11] William Brooks, a Bridgeport police officer, testified that he observed the wooden crate in the bathtub. He also stated that there were no tools around the tub, nor was there a garage located on the premises or equipment that would be needed to install a transmission into a car. Brooks did not see any vehicle that was being worked on or about to be worked on.

a graphic designer. In short, the jury could have determined that the defendant's testimony was replete with inaccuracies, contradictions and explanations that lacked credibility. The defendant's credibility was further challenged by his prior felony conviction and possible deportation.

During his trial, the defendant did not dispute the state's evidence regarding the presence of marijuana in the wooden crate. His claim was that he lacked knowledge of the contents of the crate and that he did not join in any agreement to possess marijuana. On the basis of the evidence adduced at trial, it was undisputed that a conspiracy to possess with the intent to sell one kilogram or more of marijuana existed among the individuals who transported the package from Middletown to Bridgeport. The key question is whether the defendant was part of that conspiracy, i.e., could a reasonable trier of fact conclude that he knew of the contents of the wooden crate. In this regard, the state did not produce any direct evidence regarding the defendant's knowledge of the contents. Direct evidence of the defendant's knowledge, however, is not required and, in this case, there was sufficient circumstantial evidence for the jury to find that the defendant was a participant in the conspiracy and not a mere innocent bystander.

Evidence was presented to the jury that the defendant participated in extensive maneuvers involving the acceptance of the delivery of marijuana.[12] The amount of contraband involved exceeded the amount for personal use and could be sold for a substantial profit.[13]

---

[12] While I agree fully with the majority that the state was required to produce circumstantial evidence pertaining to narcotics, I believe the state has done so, as noted herein.

[13] "The quantity of narcotics found in the defendant's possession [is] probative of whether the defendant intended to sell the drugs." *State* v. *Jennings*, 19 Conn. App. 265, 270, 562 A.2d 545, cert. denied, 212 Conn. 815, 565 A.2d 537 (1989).

The defendant actively contributed to the plan by scouting the parking lot of the Yellow Freight location, by providing a cellular telephone to help with communication, and by participating in safely transporting the marijuana from Middletown to Bridgeport. These activities were described by law enforcement witnesses as *countersurveillance techniques*. The state adduced testimony that when large quantities of drugs are transported, greater precautions are taken to prevent discovery by law enforcement. In other words, the jury heard evidence that the use of countersurveillance is integrally related to the transportation of larger quantities of drugs. Additionally, the defendant lied to the arresting officer about his employment as a graphic designer. He had sufficient cash on his person at the time of arrest to purchase approximately one pound of marijuana, which could in turn be sold for a significant profit. His explanations for his unverified employment history, the source of income that permitted him to possess two expensive automobiles were weak, at best. Moreover, his attempt to explain the suspicious activities regarding his fraudulent car registration, multiple driver's licenses and the manner in which he rented the maroon vehicle were unconvincing. Furthermore, the defendant's assertion that the crate contained a transmission was unavailing in light of the evidence that there were no tools or equipment for installing the transmission and that the box was stored in a bathtub with the shower curtain drawn. Finally, the credibility of the defendant was subject to severe scrutiny on the basis not only of his prior felony conviction, but on the basis of the fact that he faced likely deportation. "The jury is entitled to draw reasonable inferences from the evidence before it and, in performing its function, the jury brings to bear its common sense and experience of the affairs of life." (Internal quotation marks omitted.) *State* v. *Hurdle*, 85 Conn. App. 128, 142, 856 A.2d 493, cert. denied, 271 Conn. 942, 861 A.2d 516 (2004).

I now briefly turn to case law that supports my view that the evidence in the present case was sufficient to sustain the defendant's conviction. In *State* v. *Cruz*, 28 Conn. App. 575, 611 A.2d 457 (1992), we reversed the defendant's conviction for possession of marijuana on the basis of insufficient evidence. In that case, a state trooper stopped a vehicle after observing the driver, the *Cruz* defendant, change lanes without signaling. Id., 576. The defendant indicated that the vehicle belonged to a friend, and there was no sign of illegal drug use. Id., 576–77. Another trooper arrived and noticed a marijuana seed in the rear of the vehicle. Id., 577. A search of the vehicle uncovered cigarette rolling papers. Id. The passenger was in possession of heroin. Id., 577–78. We concluded that insufficient evidence existed and reversed the *Cruz* defendant's conviction. Id., 581. "Nothing in the record indicates how long the defendant had possessed the vehicle nor the circumstances under which he had obtained it." Id., 580. The defendant's mere physical presence with respect to the drugs was not enough to convict him of the possessory offense. In contrast, there was ample evidence of the defendant's active participation in obtaining the delivery of marijuana in the present case. In other words, there was more than a spatial and temporal nexus to the crate containing the illegal substance. There was evidence of active participation.

In *State* v. *Fagan*, supra, 92 Conn. App. 46, a team of police officers entered an apartment occupied by the defendant, three women and four children. The *Fagan* defendant attempted to flee from a bedroom, but was quickly subdued and apprehended. Id. In that bedroom, the officers discovered crack cocaine. Id., 47. We rejected the defendant's sufficiency of the evidence claim relating to his conviction for possession of cocaine. "Only ten or eleven seconds from the initial

knock at the door, the police forcibly entered the apartment, and three of the officers testified to seeing the defendant flee from the bedroom in which they found the cocaine. In addition, the officers in the apartment, along with the officer stationed outside to patrol the perimeter, testified to seeing the defendant attempt to escape through a window. The women, who were not seen in or near the bedroom, demonstrated no intent to escape and complied when the police told them to get down." Id., 50. In *Fagan*, we concluded that the evidence of the defendant's attempt to flee the apartment served to defeat his insufficiency claim. Similarly, in the present case, I believe that all of the circumstantial evidence presented by the state was sufficient to permit the jury to convict the defendant. *Fagan* serves as a concrete example that direct evidence of possession of the illegal substance is not required. More importantly, however, *Fagan* instructs that so long as there are some indicia of evidence connecting the defendant to the illegal substance, reversal of the conviction is not warranted.

I believe that the majority has placed too much significance on the fact that the defendant was not found with the marijuana out in the open and has not given appropriate consideration to the cumulative effect of all of the evidence and the circumstances surrounding his actions. I concede that each item of circumstantial evidence, taken in isolation, would be insufficient to convict the defendant. For example, a conviction based solely on the fact that the defendant was in the car or apartment with the wooden crate, would require a reversal and an acquittal. Nevertheless, the individual pieces of circumstantial evidence, when aggregated and considered as a whole, reached a level that transformed the issue of the defendant's guilt from a legal question to a factual one, and a reversal of the jury's factual determination is not warranted in this case. As I stated

at the outset, "[*i*]*t is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Garner*, supra, 270 Conn. 473.

In reaching my conclusion that sufficient evidence existed to support the defendant's conviction, I am mindful of the concern that an innocent bystander could be at risk because of his or her presence in proximity to illegal contraband. "Where the defendant is not in exclusive possession of the premises where the narcotics are found, it may not be inferred that [the defendant] knew of the presence of the narcotics and had control of them, unless there are other incriminating statements or circumstances tending to buttress such an inference. . . . To mitigate the possibility that innocent persons might be prosecuted for . . . possessory offenses and to assure that proof exists beyond a reasonable doubt, it is essential that the state's evidence include more than just a temporal and spatial nexus between the defendant and the contraband." (Citation omitted; internal quotation marks omitted.) *State* v. *Leon-Zazueta*, 80 Conn. App. 678, 683, 836 A.2d 1273 (2003), cert. denied, 268 Con. 901, 845 A.2d 405 (2004); see also *State* v. *Parent*, 8 Conn. App. 469, 473, 513 A.2d 725 (1986) ("[w]e also agree that mere acceptance of a package containing narcotics is an insufficient basis for an inference of knowledge of its contents; otherwise the recipient of the package would be liable to conviction, not because of the criminality of his own behavior but because of the wholly unilateral act of the sender" [internal quotation marks omitted]). In my view, however, the concerns raised in *Leon-Zazueta* and *Parent* do not exist in the present case. The jury in this case had ample evidence on which to conclude that the defendant was not merely "in the wrong place at the wrong time," but was in fact a willing participant in a

criminal conspiracy to transport and sell a significant quantity of marijuana. Simply put, considering the evidence presented by the state, it was the jury's province to determine whether the defendant was an innocent bystander or an active participant in the criminal conspiracy. The jury in this case made its determination in favor of convicting the defendant, and we should not override that decision on the basis of the cold, printed record. See, e.g., *State* v. *Jones*, 234 Conn. 324, 333, 662 A.2d 1199 (1995).

For all the reasons stated, I respectfully dissent.