# STATE OF CONNECTICUT *v.* ANDRE D. MARTIN
## (SC 17802)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued October 19, 2007—officially released January 22, 2008

*C. Robert Satti, Jr.*, senior assistant state's attorney, with whom, on the brief, was *Jonathan C. Benedict*, state's attorney, for the appellant (state).

*Arthur L. Ledford*, special public defender, for the appellee (defendant).

*Opinion*

NORCOTT, J. The principal issue in this certified appeal is whether the state introduced sufficient circumstantial evidence to support a permissive inference by the jury that the defendant had knowledge that a package contained illegal narcotics, considering the

defendant's actions before, during and after a controlled delivery of the package. The state appeals, following our grant of certification,[1] from the judgment of the Appellate Court reversing the trial court's judgment, rendered after a jury trial, convicting the defendant, Andre D. Martin, of attempt to possess one kilogram or more of marijuana with the intent to sell by a person who is not drug-dependent in violation of General Statutes §§ 21a-278 (b)[2] and 53a-49 (a),[3] possession of four ounces or more of a cannabis-type substance in violation of General Statutes § 21a-279 (b),[4] and conspiracy to possess one kilogram or more of marijuana with the intent to sell in violation of General Statutes §§ 21a-278 (b) and 53a-48 (a).[5] *State* v. *Martin*, 98 Conn. App. 458,

[1] We granted the state's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly conclude that there was insufficient evidence of the crimes of attempt to possess one kilogram or more of marijuana with the intent to sell, possession of four ounces or more of marijuana, and conspiracy to violate the drug laws?" *State* v. *Martin*, 281 Conn. 901, 902, 916 A.2d 477 (2007).

[2] General Statutes § 21a-278 (b) provides in relevant part: "Any person who . . . possesses with the intent to sell . . . one kilogram or more of a cannabis-type substance . . . and who is not at the time of such action a drug-dependent person, for a first offense shall be imprisoned not less than five years nor more than twenty years . . . ."

[3] General Statutes § 53a-49 (a) provides: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[4] General Statutes § 21a-279 (b) provides in relevant part: "Any person who possesses or has under his control . . . four ounces or more of a cannabis-type substance . . . for a first offense, may be imprisoned not more than five years or be fined not more than two thousand dollars or be both fined and imprisoned . . . ."

[5] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

459–60, 909 A.2d 547 (2006). On appeal, the state claims that the Appellate Court improperly concluded that there was insufficient evidence to support the jury's verdict that the defendant was guilty of the charged offenses beyond a reasonable doubt. We agree with the state. Accordingly, we reverse the judgment of the Appellate Court and remand the case to that court for consideration of the defendant's remaining claims on appeal.

The opinion of the Appellate Court sets forth the following facts that the jury reasonably could have found, and the relevant procedural history. "At the end of May, 2003, Donahue Hibbert, a special agent assigned to the Bridgeport office of the federal Drug Enforcement Administration (DEA) was contacted by Thomas Barbee, an agent with the Tucson, Arizona, office of the DEA. Barbee contacted Hibbert regarding a suspicious package that had been left at the Yellow Freight Company (Yellow Freight) in Tucson to mail to an address in Bridgeport. Although the address to which the package was to be mailed existed, a background investigation revealed that the name to whom the package was addressed was fictitious. On either May 31 or June 1, 2003, the DEA agreed to allow the package to be routed to Connecticut, but with delivery at the Yellow Freight facility in Middletown. No surveillance was conducted on the package in route.

"When the package arrived at the Middletown facility on June 9, 2003, Yellow Freight informed Hibbert, who had obtained a federal search warrant for the package prior to its arrival. Hibbert brought the package to the state police building located in Meriden, which is approximately five to ten miles from Yellow Freight. Together with state police, Hibbert opened the package, which was found to be a wooden crate. Inside were four white buckets that resembled five gallon paint buckets. Each bucket contained one or more large bun-

dles heavily wrapped in plastic. Upon examining the material packed in the bundles, Hibbert believed the substance was marijuana on the basis of his extensive previous experience, but he did not perform a field test on the substance. Later laboratory tests confirmed that the substance in the package was marijuana, and the total weight of the material was approximately eighteen pounds. The marijuana, at the point of entry into the country, would sell wholesale for $400 to $500 per pound and would sell retail for $1000 to $1200 per pound. In the Bridgeport area, the marijuana would have a markup of three to four times the original retail price per pound.

"Because the total weight of marijuana did not meet the threshold for federal prosecution, it was decided that the high intensity drug trafficking area task force, comprised of federal, state and local officials, would seek state prosecution of any violation of the state drug dependency laws. The state's attorney's office decided that all but 4.4 ounces of the marijuana would be removed from the package. The package then was filled to approximate its original weight. Jeremy DiPietro, a detective with the Bridgeport police department, and a state trooper took over the investigation and, on the evening of June 9, 2003, the state trooper, working undercover, telephoned the person Yellow Freight was to contact to pick up the package. He told the person to pick up the package at approximately noon the following day. On June 10, 2003, the trooper and DiPietro transferred the package from the state police office back to Yellow Freight.

"On June 10, 2003, police set up surveillance of Yellow Freight and the immediate surrounding area. Hibbert and DiPietro were at 'point of contact' in the Yellow Freight parking lot, approximately 2000 feet from the loading dock. William Brooks, a detective with the Bridgeport police department, was located in the load-

ing dock area conducting video surveillance. Edwin Kohl, a state detective assigned to the statewide cooperative crime control task force with the DEA in Bridgeport, conducted aerial surveillance from a DEA plane using binoculars and a camera. The surveillance operation of the Yellow Freight facility on June 10, 2003, revealed the following scenario.

"At approximately 12:15 p.m., a tan Mitsubishi Galant entered the lower parking lot of the Yellow Freight complex with a man driving and a woman in the front passenger seat. The woman, later identified as Janine Crockett, got out of the car and spoke with a Yellow Freight representative. The man in the car [Keith Mangan] appeared to be talking on a cellular telephone as Crockett reappeared, spoke to him and then got back into the car. The car left the lot and turned onto Country Club Road, where it rendezvoused with another vehicle, a maroon Chevrolet, for approximately one to two minutes. The tan Mitsubishi then returned, and Crockett again got out of the vehicle, this time holding an unidentifiable object in her left hand. When she again returned to the vehicle, it backed up to the loading dock, and [Mangan] made a call on [a] telephone. A Yellow Freight employee brought the package to the individuals in the vehicle. The package at first was too large to maneuver into the vehicle, and Crockett had to move up her seat in order to fit the package in the backseat. The Yellow Freight employee handed [Mangan] a signature receipt, and he, in turn, gave it to Crockett. Crockett refused to sign the receipt and handed it back to [Mangan], who signed it himself and returned it to the employee.

"Some time after the tan Mitsubishi completed its first trip into the Yellow Freight parking lot, but before its second trip, during which its occupants picked up the package, the maroon Chevrolet entered the lot and drove into the lower parking lot where Hibbert and DiPietro were located. The vehicle, which was occupied

by two men, one of whom later was identified as the defendant,[6] drove slowly around the lot. It then stopped, and the defendant, who was a passenger in the vehicle, got out of the car. The defendant was out of the vehicle for fewer than five minutes, during which time he walked around the lot, casually looking at the vehicles in the lot as he passed them. He then returned to the vehicle, and the Chevrolet left the lot.[7] Shortly thereafter, the tan Mitsubishi returned, and the package was picked up.

"When the tan Mitsubishi left the lot after the package was picked up, it was driven away from the entrance ramp to Interstate 91 and again rendezvoused with the maroon Chevrolet.[8] Then both vehicles merged onto Interstate 91 southbound and together traveled to 98 Holly Street in Bridgeport.[9] As they traveled, the two vehicles maintained a consistent distance from each other, remained primarily in the right lane and traveled within the speed limit; the vehicles did not make any quick lane changes or do anything else to attract atten-

[6] The defendant testified during trial that the other occupant in the maroon Chevrolet was David Campbell.

[7] "Hibbert testified that, on the basis of his experience as a law enforcement officer, the defendant's activities in the parking lot constituted a method of countersurveillance." State v. Martin, supra, 98 Conn. App. 483 (Schaller, J., dissenting). Kohl "explained countersurveillance as 'surveilling to see if anyone is surveilling them.' " Id., 484 n.8.

[8] "Kohl observed the tan and maroon vehicles exit the Yellow Freight location and enter another parking lot. . . . After a few minutes, the two vehicles doubled back and began traveling southbound on Interstate 91." State v. Martin, supra, 98 Conn. App. 484 (Schaller, J., dissenting). According to both Kohl and Hibbert, this behavior also constituted countersurveillance. Id., 484 and n.9. Hibbert testified: " 'Our experience has been [that this tactic is] basically to make sure they are not being followed by law enforcement or anybody else. The vehicles have performed this type of technique where they would turn off onto a side street, pull over, wait to see who drives by. Then maybe resume their path of travel.' " Id., 484 n.9.

[9] "The apartment located at 98 Holly Street belonged to Diana York, and . . . Mangan also resided there. Both individuals were suspected of being involved in transporting drugs." State v. Martin, supra, 98 Conn. App. 464 n.8.

tion. The surveillance team maintained sight of the vehicles until they reached their destination.

"After the vehicles reached the Holly Street residence, an individual, later identified as . . . Mangan, was seen bringing the package into the house. The defendant testified that he helped Mangan carry the crate up the stairs in front of the house. The maroon Chevrolet was not seen in front of the house again after the defendant left it and entered the house.

"The surveillance team waited several minutes after seeing the package brought into the house before executing the search and seizure warrant. It was understood by the officers executing the warrant that all people involved were to be arrested. When Hibbert, who was the first officer at the front door of the house, approached, a woman identified as Diana York was on the porch. Hibbert identified himself, and York ran inside and slammed the front door shut. An officer behind Hibbert opened the door with a breach tool, and Hibbert entered the apartment. York was just inside the front door, and the defendant was approximately twelve feet from the door, in the living room. Mangan was in the bedroom, which was off to the left. Hibbert told everyone to get on the floor, and everyone, including the defendant, was compliant. Hibbert located the crate, still sealed, in the bathroom, inside a freestanding tub and concealed by a shower curtain. The defendant and Mangan were equidistant from the bathroom where the package was discovered.

"Hibbert conducted a patdown search of the defendant. The defendant was in possession of a wallet, a cellular telephone, an $800 check and $1291 in cash.[10] The cash was comprised of a few fifty dollar bills, but

---

[10] "Hibbert testified that the street value of one pound of marijuana at that time was approximately $1200." *State* v. *Martin*, supra, 98 Conn. App. 485 (*Schaller, J.*, dissenting).

mostly twenty, ten and five dollar bills. The defendant told Hibbert that the cash was for a car payment he had to make on his Mercedes Benz, which was being repaired that day. The defendant did not have any weapons, drugs, or drug paraphernalia on his person. After the defendant was arrested, Hibbert checked his name with the narcotic and dangerous drugs information systems, which revealed that the defendant had no past drug related offenses and was not the subject of a current drug related investigation." *State* v. *Martin*, supra, 98 Conn. App. 460–65.

Judge Schaller dissented from the majority opinion of the Appellate Court, and his separate opinion sets forth the following testimony that was elicited from the defendant on cross-examination.[11] The defendant "stated that he believed the crate contained a transmission[12] and claimed essentially that he was doing a favor for a friend." Id., 486 (*Schaller, J.,* dissenting). "Although he had been living in Connecticut for at least four years prior to the trial, the defendant did not have a Connecticut driver's license. He initially had a New York driver's license and then obtained a Florida driver's license in March, 2003. The defendant never resided at the addresses listed on either of his driver's licenses, and his personal vehicle was registered to a post office box in New Rochelle, New York. The defendant used

[11] The Appellate Court correctly determined that, because the defendant elected to take the witness stand, appellate review of the sufficiency of evidence against the defendant "encompasses not only evidence adduced during the state's case-in-chief, but also all reasonable inferences the jury could have drawn from the defendant's testimony." *State* v. *Martin*, supra, 98 Conn. App. 465 n.9, citing *State* v. *Perkins*, 271 Conn. 218, 220–22, 856 A.2d 917 (2004) (explaining and upholding constitutionality of "waiver rule").

[12] "[Brooks] a Bridgeport police officer, testified that he observed the wooden crate in the bathtub. He also stated that there were no tools around the tub, nor was there a garage located on the premises or equipment that would be needed to install a transmission into a car. Brooks did not see any vehicle that was being worked on, or about to be worked on." *State* v. *Martin*, supra, 98 Conn. App. 486 n.11 (*Schaller, J.,* dissenting).

his false Florida address to rent the Chevrolet that was used on June 10, 2003.[13] The defendant admitted that he never had paid taxes to either the state or federal government, although he indicated that he believed he paid taxes to the government when making car insurance payments. The defendant was unable to account for the origin of money he used to pay for rent, food for himself and his family, car payments and jewelry, especially during periods of time when he claimed not to have had a job and was receiving welfare payments from the state. The defendant could not indicate clearly the dates during which he was employed, and evidence was presented that he had lied to Hibbert about his job, stating that he was unemployed on June 10, 2003, but that his prior job was as a graphic designer when, in fact, he worked in a hair salon." Id., 465–66. "The defendant admitted that he had a prior felony conviction for assaulting his girlfriend in 1999. Due to his immigration status, another felony conviction likely would result in his deportation to Jamaica." Id., 486 (*Schaller, J.*, dissenting).

The state charged the defendant with attempt to possess one kilogram or more of marijuana with the intent to sell by a person who is not drug-dependent in violation of §§ 21a-278 (b) and 53a-49 (count one), possession of four ounces or more of a cannabis-type substance in violation of § 21a-279 (b) (count two), and conspiracy to possess one kilogram or more of marijuana with the intent to sell in violation of §§ 21a-278 (b), 21a-277 (b) and 53a-48 (a) (count three). *State* v. *Martin*, supra, 98 Conn. App. 459–60. After a jury trial, the defendant was convicted on all counts, and the

---

[13] "The state, during its cross-examination, suggested that the reason for using this license was to make it more difficult to trace the rental vehicle back to the defendant." *State* v. *Martin*, supra, 98 Conn. App. 486 (*Schaller, J.*, dissenting).

trial court sentenced the defendant to a total effective sentence of twelve years imprisonment.[14] Id.

The defendant appealed from the trial court's judgment of conviction to the Appellate Court, claiming, inter alia, that "the state presented insufficient evidence to prove beyond a reasonable doubt that he (1) had dominion and control over the marijuana and (2) had knowledge that marijuana was contained in the package." Id., 466. The Appellate Court issued a divided opinion, and the majority determined that the state had failed to prove, beyond a reasonable doubt, that the defendant had knowledge that the package contained marijuana, a necessary element of all three counts. Id., 469–70, 473. Specifically, the Appellate Court concluded that, although the evidence presented by the state "may show that the defendant knew he was engaging in some type of illicit activity . . . [it does] not show that he knew the precise nature of the contents of the package." Id., 470. Accordingly, the Appellate Court majority "agree[d] with the defendant that the state presented insufficient evidence that he knew the contents of the package."[15] Id., 466. The Appellate Court, therefore, reversed the judgment of the trial court, without reaching the rest of the defendant's claims on appeal,[16] and

[14] On April 30, 2004, the defendant was sentenced to twelve years imprisonment for count one, with a mandatory minimum of five years; five years for count two, to run concurrently with counts one and three; and twelve years for count three, with a mandatory minimum of five years, to run concurrently with counts one and two.

[15] Because the Appellate Court concluded "that the evidence was insufficient to prove the element of knowledge for all three charges . . . [the court did] not decide whether the state presented evidence sufficient to prove that the defendant exercised dominion and control over the package." State v. Martin, supra, 98 Conn. App. 466 n.10.

[16] In addition to his sufficiency of evidence claims, the defendant also claimed on appeal: "(1) that his due process rights were violated, specifically his right against double jeopardy, because of his conviction of both attempt to possess one kilogram or more of marijuana with the intent to sell and possession of more than four ounces of marijuana, and (2) that the court improperly excluded as hearsay statements by his alleged coconspirators that exculpated him." State v. Martin, supra, 98 Conn. App. 460 n.5. The

it remanded the case with direction to render a judgment of not guilty. Id., 473. This certified appeal followed. See footnote 1 of this opinion.

On appeal to this court, the state relies largely on Judge Schaller's dissent in claiming that the Appellate Court improperly concluded that there was insufficient evidence to prove an essential element of all three charges—namely, the defendant's knowledge that the package contained marijuana—and that reversal of the trial court's judgment of conviction was, therefore, required.[17] Specifically, the state agrees with the dissent's determination that sufficient circumstantial evidence has been presented which, in the aggregate, allowed the jury reasonably to find that the defendant was an active participant in a conspiracy to possess with the intent to sell one kilogram or more of marijuana, and, as a result, there was also sufficient evidence to convict the defendant of the other charges under the *Pinkerton* doctrine. See *Pinkerton* v. *United States*, 328

Appellate Court did not reach these claims, however, because it "agree[d] with the defendant that the evidence was insufficient to sustain his conviction . . . ." Id.

[17] In his dissent, Judge Schaller determined "that the majority ha[d] placed too much significance on the fact that the defendant was not found with the marijuana out in the open and ha[d] not given appropriate consideration to the cumulative effect of all the evidence and the circumstances surrounding his actions." *State* v. *Martin*, supra, 98 Conn. App. 490. Judge Schaller concluded that, "there was sufficient circumstantial evidence to sustain the conviction of the defendant . . . of conspiracy to possess with the intent to sell one kilogram or more of a cannabis-type substance." Id., 473–74 (*Schaller, J.*, dissenting). Judge Schaller further determined that, "[b]y operation of *Pinkerton* liability [*Pinkerton* v. *United State*, 328 U.S. 640, 66 S. Ct. 1180, 90 L. Ed. 2d 1489 (1946)] . . . the defendant's conviction of attempt to possess with the intent to sell one kilogram or more of a cannabis-type substance and possession of more than four ounces of marijuana were supported by the evidence adduced in this case." Id., 474. Judge Schaller then concluded that, "considering the evidence presented by the state, it was the jury's province to determine whether the defendant was an innocent bystander or an active participant in the criminal conspiracy. The jury in this case made its determination in favor of convicting the defendant, and we should not override that decision on the basis of the cold, printed record." Id., 492.

U.S. 640, 647–48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946) (if evidence is sufficient to show that one member of conspiracy committed substantive offense within scope of and in furtherance of conspiracy, then all coconspirators are responsible for committing substantive offense).

In response, the defendant argues that the state presented neither direct nor circumstantial evidence that he knew the package contained marijuana. In addition, the defendant argues that the case law relied on by the state is inapposite because: (1) the defendant was not in exclusive possession of the apartment wherein the package was discovered, nor did he rent or live in the apartment; (2) the marijuana within the package was not in plain view; (3) the law enforcement officers never witnessed an illegal drug transaction take place; and (4) the evidence in cases wherein the defendants were found to have knowledge of a package's narcotic contents were substantially stronger than in the present case. We agree with the state.

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude

that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Ledbetter*, 275 Conn. 534, 542–43, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

I

We begin with an analysis of whether sufficient evidence existed upon which the jury could have found the defendant guilty of conspiracy with the intent to sell one kilogram or more of a cannabis-type substance.

"To establish the crime of conspiracy under § 53a-48, the state must show that there was an agreement between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy . . . . The state must also show intent on the part of the accused that conduct constituting a crime be performed. . . . The existence of a formal agreement between the parties need not be proved; it is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act. . . .

"[I]t is not necessary to establish that the defendant and his coconspirators signed papers, shook hands, or uttered the words we have an agreement. . . . [T]he requisite agreement or confederation *may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Patterson*, 276 Conn. 452, 461–62, 886 A.2d 777 (2005).

As the defendant was alleged to be part of a conspiracy to violate § 21a-278 (b), "[i]t is [also] necessary to identify the elements of possession with the intent to sell one kilogram or more of a cannabis-type substance to determine whether the defendant and his coconspirators *intended* to commit the crime." (Emphasis added.) *State* v. *Martin*, supra, 98 Conn. App. 481 (*Schaller, J.*, dissenting). "[T]o prove illegal possession of a narcotic substance, it is necessary to establish that the defendant knew the character of the substance, knew of its presence and exercised dominion and control over it. . . . Where . . . the [narcotics were] not found on the defendant's person, the state must proceed on the theory of constructive possession, that is, possession without direct physical contact. . . . One factor that may

be considered in determining whether a defendant is in constructive possession of narcotics is whether he is in possession of the premises where the narcotics are found. . . . Where the defendant is not in exclusive possession of the premises where the narcotics are found, it may not be inferred that [the defendant] knew of the presence of the narcotics and had control of them, unless there are other incriminating statements or circumstances tending to buttress such an inference." (Citations omitted; internal quotation marks omitted.) *State* v. *Berger*, 249 Conn. 218, 225, 733 A.2d 156 (1999). "While mere presence is not enough to support an inference of dominion or control, where there are other pieces of evidence tying the defendant to dominion and control, the [finder of fact is] entitled to consider the fact of [the defendant's] presence and to draw inferences from that presence and the other circumstances linking [the defendant] to the crime." (Internal quotation marks omitted.) *State* v. *Smith*, 94 Conn. App. 188, 194, 891 A.2d 974, cert. denied, 278 Conn. 906, 897 A.2d 100 (2006).

It is undisputed that a conspiracy existed, and that the defendant assisted in the effort to accept and to deliver the package to 98 Holly Street in Bridgeport. The defendant claims that he was *not part of that conspiracy* because he did not know the package contained marijuana, but rather thought that he merely was helping a friend pick up and deliver a vehicle transmission. We conclude that the following evidence, outlined by Judge Schaller in his dissenting opinion, more than adequately highlights why a jury reasonably could have inferred that the defendant was an active member of the conspiracy beyond a reasonable doubt. "[T]he defendant participated in extensive maneuvers involving the acceptance of the delivery of marijuana. The

amount of contraband involved exceeded the amount for personal use[18] and could be sold for a substantial profit.[19] The defendant actively contributed to the plan by scouting the parking lot of the Yellow Freight location,[20] by providing a cellular telephone to help with communication,[21] and by participating in safely trans-

---

[18] Hibbert testified that, in his opinion, "that amount of marijuana could not be, would not be normally used for personal consumption."

[19] Hibbert testified that, although "the marijuana would retail in the streets of Bridgeport for approximately [$]1000, $1200 per pound . . . [y]ou could actually break it up and make three or four times as much if it were to [be] broken up into smaller quantities." With regard to the basis of his opinion, Hibbert further testified that his specialty within the DEA task force was marijuana, that he has been assigned to the Bridgeport area since 1998, and that marijuana prices are determined through controlled purchases, regional DEA reports and testimony of arrested suspects.

[20] The defendant testified that the reason he had exited the maroon Chevrolet in the Yellow Freight parking lot was because he had to relieve himself urgently, yet he did not notice the rest area on Interstate 91 north, just prior to the exit off of which Yellow Freight is located. The defendant further testified: "[W]hen I got to the parking lot I told the driver [of the maroon Chevrolet, Campbell] that I wanted to [relieve myself]. So he go around looking for somewhere because I couldn't [urinate] like in the middle where the car was. So he go around the corner and then he go down a little bit in the middle and I told him, I said stop the car because I'm going to [urinate] . . . . Then I get out of the car [and] . . . I walk behind [a vehicle]. I [relieve myself] right there and get back in the car and sit." The defendant later testified during trial that he and Campbell circled the *entire* parking lot before stopping near the area where they entered the lot, and that he relieved himself *between* two cars while *facing* the road leading to the entrance of the parking lot.

Hibbert testified during trial that the defendant, after exiting the maroon Chevrolet in the Yellow Freight parking lot, was "looking around and looking at the vehicles in front of him," then returned to the passenger seat of the vehicle after "less than five minutes." Hibbert further testified: "The vehicle stayed in the area a few minutes [after the defendant returned], then left out of the parking lot."

During oral argument before this court, the defendant's attorney conceded that a jury could possibly infer, based on the evidence and testimony of law enforcement officials during trial, that the defendant was engaging in countersurveillance.

[21] Hibbert testified that a Nextel cellular telephone was discovered on the defendant while conducting a cursory search for weapons following law enforcement's entrance of 98 Holly Street on June 10, 2003. Hibbert further testified that, although Mangan was videotaped using a cellular telephone

porting the marijuana from Middletown to Bridge-
port.[22] These activities were described by law enforce-
ment witnesses as *countersurveillance techniques*.[23]
The state adduced testimony that when large quantities

at Yellow Freight, a cellular telephone was not recovered from Mangan at 98 Holly Street.

[22] It is important to note that the tan Mitsubishi and the maroon Chevrolet never were in the Yellow Freight parking lot together at the same time, yet they rendezvoused twice before driving back to Bridgeport. Kohl testified during trial that, after the tan Mitsubishi had picked up the package from Yellow Freight, it drove north on Country Club Road, in the opposite direction of the Interstate 91 entrance ramp, and met the Chevrolet in an office parking lot. The defendant testified at trial that, during this meeting in the office parking lot: (1) Campbell, who was driving the Chevrolet, began driving the Mitsubishi; (2) Mangan, who was driving the Mitsubishi, became a passenger in the Chevrolet; and (3) the defendant, who was a passenger in the Chevrolet, became the driver of the Chevrolet. The Mitsubishi and the Chevrolet then drove back to Bridgeport, via Interstates 91 and 95, and once the vehicles arrived at 98 Holly Street, the defendant assisted Mangan in bringing the package into the residence.

[23] The following exchange took place, at trial, between the state and Hibbert with respect to the actions of the maroon Chevrolet and the defendant in the Yellow Freight parking lot:

"Q. Did you have an opinion whether there was countersurveillance techniques being used at that particular time? That is when the red car comes in, [the] individual you say comes out of the car.

"A. Yes.

"Q. . . . What is the basis of your opinion?

"A. The basis of my opinion is from prior surveillances, conducting numerous, hundreds of surveillances, that this vehicle appeared to be with the tan Mitsubishi and was performing countersurveillance in the parking lot looking for [the] presence of law enforcement.

"Q. Why do you have that opinion please?

"A. From the action of the vehicle. The way the vehicle pulled into the [parking] lot very slowly, not parking right away, not finding a spot, circling around the entire lot, pulling up, parking, the passenger getting out and looking around. That to me are clear indications, from my experience, of countersurveillance."

In addition, the following exchange took place, at trial, between the state and Kohl:

"Q. Could you explain what you mean by [countersurveillance] please?

"A. What I mean by countersurveillance is they're surveilling to see if anyone is surveilling them.

"Q. Now, also in reference to the testimony you have previously given, your training and experience you have testified to, do you have an opinion based on the facts that you observed, what was related to you by fellow officers, what the two cars—what the affect of the two cars were in the pattern that you saw them on Interstate 91 and Interstate 95 was?

of drugs are transported, greater precautions are taken to prevent discovery by law enforcement.[24] In other words, the jury heard evidence that the use of countersurveillance is integrally related to the transportation of larger quantities of drugs. Additionally, the defendant lied to the arresting officer about his employment as a graphic designer.[25] He had sufficient

"A. I felt they were traveling together. The maroon vehicle was maintaining some distance and keeping an eye out, you know, and observing anything that they would think would be out of the ordinary. . . . They didn't want to be separated.

\* \* \*

"Q. Okay. In your opinion, your training and expertise and the facts you observed was there a significance in the second car in your opinion?

"A. Most definitely."

[24] Kohl testified that such heightened precautions may include adding additional vehicles to the trip, and stated that when returning to Bridgeport via Interstates 91 and 95, both the tan Mitsubishi and the maroon Chevrolet "were driving . . . within the speed limit . . . and keeping a fair distance apart of other vehicles. No sudden lane changes or anything that would attract attention." Kohl further testified: "My opinion was [that] they made a very conscious and concerted effort not to violate any motor vehicle laws as not to attract attention to themselves and . . . possibly get stopped by . . . a uniformed trooper, patrolman."

[25] The following exchange took place, at trial, between the state and Hibbert:

"Q. And did you, for example, ask [the defendant] on June [10] of 2003 if he was working at this time?

"A. Yes, I did.

"Q. And what, if any, was his response to whether he was working at this particular time?

"A. He stated that he was unemployed.

"Q. Now, did you also ask him if he had a job before he was unemployed? In other words, an occupation?

"A. Yes, I did.

"Q. And what did he tell you about his occupation please?

"A. That he was a graphic designer."

In addition, the following exchange took place between the state and the defendant:

"Q. [Y]ou also told [Hibbert] that I'm working as a barber. I work in New York and that's where the money comes from?

"A. He didn't—he didn't—he didn't ask me where did I work or anything.

"Q. Are you sure of that?

"A. He didn't. I don't remember he asking me where did I work or anything.

\* \* \*

cash[26] on his person at the time of arrest to purchase approximately one pound of marijuana, which could in turn be sold for a significant profit.[27] His explanations for his unverified employment history, the source of income that permitted him to possess two expensive automobiles[28] were weak, at best. Moreover, his attempt to explain the suspicious activities regarding his fraudulent car registration,[29] multiple driver's licenses[30] and

"Q. But if he did ask you that your answer was going to be I work as a barber at a place in New York state; correct?

"A. Yes, sir."

[26] Hibbert testified that he had found $1291 on the defendant while conducting a cursory weapons search on June 10, 2003, and that the defendant stated the money was *only* for a car payment. The defendant, on the other hand, testified at trial that the money was actually for *both* rent and a car payment.

[27] See footnote 19 of this opinion.

[28] At the time the defendant was arrested, June 10, 2003, he was leasing a S500 Mercedes. The defendant had owned a 1996 Lexus GS400, which he obtained in approximately 2000, prior to leasing the Mercedes. The defendant initially testified that he paid for the Lexus through money earned by working. The defendant later testified that his aunt bought the Lexus for him as a birthday present, because his hip was injured. The defendant then testified: "[My aunt] didn't give me. She give me $5000 and I think $2000, $7000 and pay it down, down on the car. . . . She make a down payment on it first and then she had some more payment to do. She didn't pay for it at once." The defendant testified that in approximately 2002, he traded in the Lexus for the Mercedes and received a $20,000 trade-in credit.

[29] The defendant testified that he had registered his Mercedes to a post office box in New Rochelle, New York in July, 2002, but that he lived in New Haven at that time.

[30] The defendant testified that he had a New York driver's license in July, 2002, and that the address on the license was listed as Wilder Avenue, Bronx, New York. The defendant further testified, however, that he did not live at that address, but rather, lived at 357 Union Avenue in New York. By August 23, 2002, the defendant testified that he lived on Plymouth Street in New Haven, but he never obtained a Connecticut driver's license because he was unaware that he needed one. The defendant then claimed he moved from Plymouth Street to 37 Bassett Street in New Haven between August, 2002, and June, 2003.

The defendant further testified at trial that he obtained a Florida driver's license on March 18, 2003, and that the address listed on the license was 1198 Lake Terrace, apartment N, West Palm Beach, Florida.

The following exchange then took place between the state and the defendant:

"Q. Well, you told the jury you are living in New Haven, Connecticut from August of 2002 [until] June of 2003; correct?

the manner in which he rented the maroon vehicle were unconvincing. Furthermore, the defendant's assertion that the crate contained a transmission was unavailing in light of the evidence that there were no tools or equipment for installing the transmission and that the box was stored in a bathtub with the shower curtain drawn.[31] Finally, the credibility of the defendant was subject to severe scrutiny on the basis not only of his prior felony conviction,[32] but on the basis of the fact that he faced likely deportation."[33] (Emphasis in origi-

"A. Yes, sir.

"Q. You want to change [your] story now?

"A. I'm not making a story to change.

"Q. So you went down to Florida and got a license under false pretenses; didn't you?

"A. No. That's my name.

"Q. But you lied when you told the Florida authorities you're living in West Palm Beach, Florida; didn't you?

"A. I didn't lie to them.

"Q. Sir, did you live in West Palm Beach, Florida on March 18, 2003, yes or no?

"A. No, sir.

"Q. So you lied to the Florida authorities when you said that was your residence; isn't that correct?

"A. I didn't lie to Florida authorities, sir."

[31] See footnote 12 of this opinion.

[32] The defendant testified that he previously had pleaded guilty to a felony assault and weapons charge involving a July 18, 1999 domestic dispute with the mother of his children, and that he was represented by an attorney in the matter. The defendant further testified that he did not assault the woman, nor did he have a weapon, but that he nevertheless did plead guilty to both charges.

[33] During trial, the following exchange took place between the state and the defendant:

"Q. Are you a citizen of the United States?

"A. I might. I think I am a citizen. I'm not sure because the person who filed me for. I came here when I was fourteen years old and the person who filed for me is my guardian.

"Q. Sir, you know you have a possibility of, if convicted of this crime, of being deported; don't you?

"A. Yes, sir.

"Q. Okay. And that is triggered by the fact that you have a second conviction; correct?

"A. I don't understand that, sir.

nal.) *State* v. *Martin*, supra, 98 Conn. 487–88 (*Schaller, J.*, dissenting).

After careful review of the cumulative evidence adduced at trial, and viewing the evidence in the light most favorable to sustaining the verdict, we conclude that there was ample circumstantial evidence for the jury to find, beyond a reasonable doubt, that the defendant was an active participant in the conspiracy to possess one kilogram or more of marijuana with the intent to sell in violation of §§ 21a-278 (b) and 53a-48. As stated by Judge Schaller in his dissent, "considering the evidence presented by the state, it was the jury's province to determine whether the defendant was an innocent bystander or an active participant in the criminal conspiracy. The jury made its determination in favor of convicting the defendant, and we should not override that decision on the basis of the cold, printed record." Id., 492; see also *Illinois* v. *Andreas*, 463 U.S. 765, 769 n.3, 103 S. Ct. 3319, 77 L. Ed. 2d 1003 (1983) ("the nature of the contents [in a package] and the recipient's awareness of them would be issues for the factfinder"); *State* v. *Morgan*, 274 Conn. 790, 800, 877 A.2d 739 (2005) ("[W]e do not sit as a thirteenth juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." [Internal quotation marks omitted.]). We therefore conclude that sufficient evidence existed to convict the defendant of conspiracy to possess one kilogram or more of marijuana with the intent to sell,

---

\* \* \*

"Q. You have one felony conviction; don't you?

"A. Yes, sir.

"Q. And you know that if you get a second conviction after that first felony conviction there's a good chance you're going to be deported; right?

"A. They—they can't. They can't deport. I have my—my documents, sir."

and, accordingly, the jury's verdict must stand with respect to count three.

We next address the Appellate Court majority's concern about the potential deleterious impact a decision affirming the defendant's conviction would have on future cases. Specifically, the Appellate Court majority concluded: "To hold that these facts are sufficient to satisfy the knowledge element in a possession of narcotics charge would expose to criminal culpability the innocent bystanders that this requirement was meant to protect." *State* v. *Martin*, supra, 98 Conn. App. 471–72. In reaching that conclusion, the Appellate Court relied on *State* v. *Parent*, 8 Conn. App. 469, 473, 513 A.2d 725 (1986), in which the court determined that "mere acceptance of a package containing narcotics is an insufficient basis for an inference of knowledge of its contents; otherwise the recipient of the package would be liable to conviction, not because of the criminality of his own behavior but because of the wholly unilateral act of the sender." (Internal quotation marks omitted.) We agree with that proposition, but for all the aforementioned reasons, this defendant's active participation in the conspiracy to possess one kilogram or more of marijuana, with the intent to sell, made him more than simply an "innocent bystander."

In this case, the innocent bystander concern was overcome by the cumulative evidence proffered by the state, such that a jury could make a permissible, not necessary, inference of the defendant's knowledge of the contraband. In other words, the substantive impact of the circumstantial evidence, taken as a whole, permits an inference of the defendant's knowledge of the marijuana in the package. This inference is further buttressed by the fact that the defendant in the present case *actively participated* in the overall acceptance and delivery of the package, including, but not limited to, activity that law enforcement officers testified to as

being consistent with known countersurveillance techniques. We agree, therefore, with Judge Schaller's dissent in concluding that "[t]he jury in this case had ample evidence on which to conclude that the defendant was not merely 'in the wrong place at the wrong time,' but was in fact a willing participant in a criminal conspiracy to transport and sell a significant quantity of marijuana." *State* v. *Martin*, supra, 98 Conn. App. 491–92.

## II

As the jury could have inferred, beyond a reasonable doubt, that the defendant was guilty of conspiracy to possess one kilogram or more of marijuana with the intent to sell, we further conclude that sufficient evidence was proffered by the state to convict the defendant, by operation of *Pinkerton* liability, of the first two counts as well—specifically, of attempt to possess one kilogram or more of marijuana with the intent to sell by a person who is not drug-dependent in violation of §§ 21a-278 (b) and 53a-49, and of possession of four ounces or more of a cannabis-type substance in violation of § 21a-279 (b).

"This court first explicitly adopted the *Pinkerton* principle of vicarious liability for purposes of our state criminal law in *State* v. *Walton*, 227 Conn. 32, 630 A.2d 990 (1993). Under the *Pinkerton* doctrine, which, as of the date of our decision in *Walton*, was a recognized part of federal criminal conspiracy jurisprudence . . . a conspirator may be held liable for criminal offenses committed by a coconspirator that are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy. . . . The rationale for the principle is that, when the conspirator [has] played a necessary part in setting in motion a discrete course of criminal conduct, he should be held responsible, within appropriate limits, for the crimes committed as

a natural and probable result of that course of conduct. . . .

"We concluded in *Walton* that the *Pinkerton* principle was applicable in state criminal cases, reasoning, first, that *Pinkerton* liability is not inconsistent with our penal code and, therefore, that we were not prohibited from recognizing that theory of criminal liability as a matter of state common law. . . . Without foreclosing the use of the *Pinkerton* doctrine in other circumstances, we then concluded that application of the doctrine was appropriate in *Walton,* in which [1] the defendant was a leader of the conspiracy, [2] the offense for which vicarious liability was sought to be imposed was an object of the conspiracy and [3] the offense was proved by one or more of the overt acts alleged in support of the conspiracy charge. . . .

"In *State* v. *Diaz,* [237 Conn. 518, 679 A.2d 902 (1996)], we were required to decide whether to extend the principle of vicarious liability that we adopted in *Walton* to a case in which not all of [the three *Walton*] conditions have been met, a question that we expressly reserved in *Walton.* . . . In *Diaz,* the defendant had been convicted of, inter alia, murder under the *Pinkerton* doctrine and conspiracy to commit murder. . . . The evidence showed that the defendant, along with several other individuals, had fired multiple gunshots into a motor vehicle occupied by the victim and three others. . . . The victim was struck and killed by a single bullet. . . . The defendant claimed on appeal that the court's instruction under the *Pinkerton* doctrine had been improper because, among other reasons, it was broader than the limited version of the doctrine recognized in *Walton.* . . . This court acknowledged that the state had not proved that the defendant was the leader of the conspiracy to ambush the vehicle and its occupants and, thus, had not established the first condition for *Pinkerton* liability set forth in *Walton.*

. . . We noted, however, that the evidence reasonably established that the defendant was a fully engaged member of the conspiracy who had actively participated in the shooting and that he, along with his coconspirators, intended to kill one or more of the vehicle's passengers. . . . We concluded that where . . . the defendant was a full partner in the illicit venture and the coconspirator conduct for which the state has sought to hold him responsible was integral to the achievement of the conspiracy's objectives, the defendant cannot reasonably complain that it is unfair to hold him vicariously liable, under the *Pinkerton* doctrine, for such criminal conduct. . . . We further concluded that *Pinkerton* liability may be imposed even if none of the three *Walton* conditions is present. . . .

"We also acknowledged, however, that there may be occasions when it would be unreasonable to hold a defendant criminally liable for offenses committed by his coconspirators even though the state has demonstrated technical compliance with the *Pinkerton* rule. . . . For example, a factual scenario may be envisioned in which the nexus between the defendant's role in the conspiracy and the illegal conduct of a coconspirator is so attenuated or remote, notwithstanding the fact that the latter's actions were a natural consequence of the unlawful agreement, that it would be unjust to hold the defendant responsible for the criminal conduct of his coconspirator. In such a case, a *Pinkerton* charge would not be appropriate."[34] (Citations omitted; internal

---

[34] The defendant has not raised any claims on appeal regarding the trial court's *Pinkerton* charge to the jury, which provided in relevant part: "If you should conclude that count one and two [were] violated but the defendant was not the specific individual to possess or attempted to possess the cannabis-type substances there is an additional step in deliberations. There is a doctrine in our law that provides that once a defendant's participation in a conspiracy is established he or she is responsible for each of the criminal acts of the other coconspirators which is within the scope of and in furtherance of the conspiracy. This means in these cases that if you conclude that a particular defendant is in fact guilty of conspiracy to commit a violation of our state dependency producing drug law . . . that you must

quotation marks omitted.) *State* v. *Coltherst*, 263 Conn. 478, 491–93, 820 A.2d 1024 (2003).

As discussed previously, the defendant's role in the present case was neither too attenuated, nor too remote, from the illegal conduct of his coconspirators to preclude *Pinkerton* liability, because sufficient evidence shows that he actively participated in the overall acceptance and delivery of the package containing marijuana. Thus, after review of the cumulative evidence adduced at trial, and viewing the evidence in the light most favorable to sustaining the verdict, we conclude that there is also ample evidence to support a jury's conclusion that the defendant is guilty—beyond a reasonable doubt and by operation of *Pinkerton* liability—of counts one and two, namely, of (1) attempt to possess one kilogram or more of marijuana with the intent to sell in violation of §§ 21a-278 (b) and 53a-49, and (2) possession of four ounces or more of a cannabis-type substance in violation of § 21a-279 (b).[35] We conclude,

determine whether sufficient evidence has been provided to show you beyond a reasonable doubt that another member of that same conspiracy did in fact possess the cannabis-type substances alleged in the first two counts on June [10], 2003. If such other member of the conspiracy did possess or attempt to possess a cannabis-type substance with intent to sell in count one or over four ounces in count two on June [10], 2003 and if that possession was in the scope of and in furtherance of the conspiracy of which you have concluded that this defendant was a member, then the defendant would be guilty of possession of a cannabis-type substance on June [10], 2003 as set forth in the . . . first two counts of the information. If you conclude that the defendant was a member of a conspiracy as I will charge you beyond a reasonable doubt and that another member of that conspiracy committed the act, the crime of possession or attempted possession of a cannabis-type substance on June 10, 2003, as charged in the information, and you further conclude beyond a reasonable doubt that the possession of over a kilogram of a cannabis-type substance with intent to sell in the first count or over four ounces of a cannabis-type substance in the second count was within the scope of and in furtherance of the conspiracy, then each and every member of that conspiracy would be guilty of the violations alleged in the first two counts of the information."

[35] For example, we conclude that there is more than ample direct and circumstantial evidence for the jury to have concluded, beyond a reasonable doubt, that coconspirator Mangan both attempted to possess one kilogram

therefore, that there was sufficient evidence to support the jury's guilty verdict with respect to all three counts. The Appellate Court, therefore, improperly reversed the defendant's conviction on the basis of insufficient evidence, and, accordingly, should have considered the remainder of defendant's claims on appeal. See footnote 16 of this opinion.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to consider the defendant's remaining claims on appeal.

In this opinion the other justices concurred.

or more of marijuana with the intent to sell, and actually possessed four or more ounces of a cannabis-type substance in the scope of and in further-ance of the conspiracy. Mangan was directly involved in picking up the package containing marijuana from Yellow Freight, and he physically helped carry the package into the apartment located at 98 Holly Street, where he resided with his girlfriend, York.